UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| | ) | |
| v. | ) | Criminal No. 10-82-P-S |
| | ) | |
| ROY CLARK, | ) | |
| | ) | |
| Defendant | ) | |

## RECOMMENDED DECISION ON MOTION TO SUPPRESS

Roy Clark, charged with possessing nine firearms in violation of 18 U.S.C. §§ 922(g)(8) and 924(a)(2), *see* Indictment (Docket No. 31), seeks to suppress statements that he characterizes as involuntary and/or given in asserted violation of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), *see* Motion To Suppress and Dismiss ("Motion To Suppress") (Docket No. 40) at 1.[1] He further seeks to suppress, as fruit of the poisonous tree, additional evidence gathered as a result of these asserted violations. *See id.*

An evidentiary hearing was held before me on August 17, 2010, at which the defendant appeared with counsel. The government tendered two witness and offered two exhibits, which were admitted without objection. The defendant tendered no witnesses and offered no exhibits. After both sides rested, counsel for each argued orally. I now recommend that the following findings of fact be adopted and that the Motion To Suppress be denied.

---

[1] Pursuant to *Miranda*, an accused must be advised prior to custodial interrogation "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda*, 384 U.S. at 478-79.

## I. Proposed Findings of Fact

At approximately 2:45 a.m. on February 15, 2010, the South Portland Police Department ("SPPD") received a report of a domestic dispute between Roy Clark, the defendant, and his wife at their residence on Washington Avenue. When police reported to the residence, they were unable to locate the defendant, but they observed several guns. They did not then seize them, learning only later that morning that the defendant was prohibited, by virtue of the entry of a protection from abuse order against him, from possessing them.

At approximately 7:00 a.m., the SPPD mobilized several officers starting their shifts to pursue the case by locating the defendant, arresting him, and seizing guns believed to belong to him. Among these were Detective Sergeant Kevin Webster, a 23-year veteran of the SPPD, and police officer Kevin Battle, a 25-year veteran of the SPPD. At 9:30 a.m., several officers returned to the defendant's residence. They did not find him there, but they located and seized eight to 11 long firearms. One of the defendant's relatives informed them that there were other firearms, all handguns. However, officers were unable to locate those guns.

At about 11:20 a.m., Battle stopped the defendant's vehicle, arrested him, and transported him to the SPPD station. Battle and another officer, Sergeant Tom Simons, brought the defendant to an interview room, where they removed his handcuffs. The room, which was approximately 10 feet by 12 feet, contained bare walls, chairs, a round table in the center, and a videocamera that recorded the ensuing interview. That tape was introduced into evidence, without objection, as Gov't Exh. 1 ("Interview Room DVD").

At 11:23 a.m., Webster, who was in charge of the defendant's case insofar as it concerned the prohibited possession of firearms, commenced interviewing him, with the primary goal of locating the missing handguns. Battle and/or Simons were present in the interview room

2

with the defendant for periods of time, including after Webster departed at 12:06 p.m. At the outset, Webster read the defendant each of his *Miranda* rights. The defendant told Webster that he understood each. He did not state that he wished to invoke any of those rights, and Webster began asking questions.

Webster soon moved to the subject of the whereabouts of the handguns. The defendant initially denied that there were any guns in the house, that he personally possessed any guns, or that he had removed any guns. At approximately 11:33 a.m., after acknowledging, in response to a question, that he knew that he was not allowed to have any guns, but again denying that he had any, he stated: "I guess this is where I have to stop and ask for a lawyer, I guess." Interview Room DVD at 11:32:52. At the same time as the defendant uttered the words "and ask for a lawyer, I guess," Webster spoke over him in a louder tone of voice, stating: "Well, here's where I will just be honest with you and tell you what we're going to do. I was just looking for some honesty from you, and I was not going to put the screws to you." *Id*. at 11:32:59.

Webster heard the defendant say, "I guess this is where I have to stop . . . ." But he did not hear the rest of that sentence. Nor did he hear it upon initially reviewing the videotape. Only after the defendant alleged that he had asked for a lawyer, and Webster viewed that portion of the tape several times with the Assistant United States Attorney, did he hear the remaining words. He now acknowledges that the defendant stated: "I guess this is where I have to stop and ask for a lawyer, I guess."[2] While Webster heard the defendant say, "I guess this is where I have to stop," he did not understand that phrase to be an invocation of the defendant's right to remain silent. The following exchange immediately ensued:

---

[2] Webster's testimony that he did not hear the defendant utter the word "lawyer" is credible. The defendant happened to be dropping his voice at the same time as Webster raised his. The words, "and ask for a lawyer, I guess," are virtually inaudible.

3

>Webster: What I will do is, the guns that we did get, we will run a DNA check on them. My guess is your DNA's going to be on them. You're going to be charged, which wasn't my goal here, alright? My 23 years I've been doing this, and I don't like being dicked around. A little honesty goes a long way, OK?
>
>***
>
>Webster: That's all I have is my word, and if I tell you I'm going to do something, I'm going to do it. Right now, here's the way I look at it. You have two options . . . . Do you necessarily want to be charged with a gun offense?
>
>Defendant: No, of course not.
>
>Webster: Then if you don't, this is what I will offer you. Do you see that right there (pointing to the videocamera)?
>
>Defendant: Mm-hmm.
>
>Webster: We're being recorded. So it's not like I'm going to trick-fuck you or lie to you. If you tell me where the guns are, I will not charge you with being a prohibited person. We will take the guns and hold them here, OK? We're not stealing them. We're not going to keep them. We will keep them here until this protection order stuff is done. When you have the right to have the guns back, we will give them back to you.

*Id*. at 11:33:06.

Webster believed that he possessed the authority and discretion to refrain from charging the defendant with unlawful possession of the guns. At hearing, he termed the offer "unorthodox," but testified that he made it because he would "rather have the guns off the streets than seek prosecution." He explained that he believed that the defendant was the only person who knew where the guns were, and that failing to locate them posed a public safety threat.

At 11:37 a.m., Webster reassured the defendant: "I have no reason to lie to you. Like I said, 23 years, that's all I have is my reputation." *Id*. at 11:37:25. The defendant responded: "That's fair enough. The rest of them [the guns] are up in the attic of that house." *Id*. at 11:37:40. Webster left the room to begin making arrangements to search for the guns. He reentered with Battle, turned to the defendant and stated: "This is what we agreed to, correct?"

*Id*. at 11:42:10.  He then told Battle, in the defendant's presence: "The guns, the remaining guns, are in the attic, OK, but we're not going to charge him with that.  For now, we're just going to take the guns . . . and until he gets that paperwork squared away, the protection order . . . ." *Id*. at 11:42:15.  Noting that officers had already been to the residence, seized rifles, and not found handguns, Battle warned: "Don't throw out this [inaudible] deal, don't be holding back." *Id*. at 11:43:05.

For nearly 20 more minutes, Battle and Webster continued to press the defendant as to the veracity of his report.  The defendant continued to insist that he had left the guns in the attic, offering to go look with the police and suggesting that, if they were not there, someone else must have moved or taken them.

When Battle questioned the defendant as to whether he had taken or handled the handguns that morning, the defendant stated: "He [Webster] gave me a deal, I mean, you guys are going to hang onto them[.]" *Id*. at 11:46:17.  Battle responded: "I don't know if he [Webster] told you . . . this place is recorded.  This ain't television, guy, we're not going to sit here and pull some BS and then all of a sudden afterwards [. . .], because we've got to explain everything." *Id*. at 11:46:24.  A short time later, Battle told the defendant: "You do realize that he [Webster] can't tell you one thing and do another.  I can't tell you one thing and do another.  That throws the whole case out and ruins my credibility." *Id*. at 11:50:42.

Before noon, Webster left the interview room for a few minutes.  When he returned at about noon, the following exchange ensued:

> Webster:  Did you take the guns with you this morning?
>
> Defendant:  No.
>
> Webster:  Are you sure?

5

> Defendant: I'm sure.
>
> Webster: Because everybody I've talked to says they're not in the attic. . . . I think you're fucking lying to us, and that's not going to help you. You know damn well what you did this morning.
>
> Defendant: Yeah, I do, I did know exactly what I did, and this doesn't make any sense to me. If we can go, I can try and find them and see if somebody moved them, took them.
>
> ***
>
> Webster: I hope for your sake you're telling the truth. . . . I don't know you, you don't know me. I have absolutely no reason to lie to you.
>
> Defendant: You've already given me a deal.
>
> Webster: I have. But we've got to find the guns.

*Id*. at 12:00:50. At 12:06 p.m., Webster left to search the attic of the defendant's residence for the handguns. Battle remained with the defendant, engaging in small talk with him for nearly an hour as the two awaited word from Webster. Seconds after Webster left, Battle reiterated: "Now you understand, I can't tell you I'm going to do A and turn around and do B. I can't tell you we're not going to charge you and turn around and charge you. We can't do that. . . . So it's to your advantage to come clean on this." *Id*. at 12:06:40.

Webster found no guns in the attic of the defendant's residence. A family member informed him that, earlier in the day, the defendant had left the residence with a black bag containing handguns. At 12:48 p.m., Simons returned to the interview room and informed the defendant that Webster wanted to know what had happened to the black duffel bag that the defendant took with him that morning. The defendant said that he had taken only plastic bags containing clothes, not a duffel bag. Simons left and spoke with Webster, who instructed him to charge the defendant with being a prohibited person in possession of a firearm. Webster testified that this instruction, in his view, was not inconsistent with his promise not to charge the

6

defendant if he divulged the whereabouts of the guns: a deal was a deal, and, despite having been provided ample opportunity to disclose the guns' location, the defendant had failed to do so.

At 1:01 p.m. Simons returned and informed the defendant that he was going to jail. The following exchange took place:

> Simons: I'm not sure who Sergeant Webster's been talking to or what's going on, but it sounded like whatever he's been talking to you about, as far as a good offer and everything else – it sounded too good to be true to me – but he said that it . . . hinged on getting all truth . . . . He just called me and says he's not convinced after what he's found out, I don't know exactly what.
>
> Defendant: I thought he was going to let me go.
>
> Simons: So we're going to take you over and we're going to book you in. . . .
>
> Defendant: So he's not giving me the deal now? I don't get it.
>
> Simons: I'm not entirely sure what he found out there, but he said that . . .
>
> Defendant: Oh man, that's not even my fault that they're…. Is that officer [Webster] around?
>
> Simons: He's still out there, he's still trying to find out exactly a little more about it, but he said for now, to take you over.
>
> ***
>
> Defendant: So when he [Webster] was talking to the camera up there and said he wasn't going to rescind it and all that, that was just a lie? I don't understand.
>
> Battle: You're going to have to deal with him on that. I don't understand. I'm just the messenger. We'll see what they find out.

*Id*. at 1:01:28.

The defendant was placed in handcuffs, and Battle escorted him to the back seat of his cruiser to transport him to Cumberland County Jail. During that trip, a cruiser camera recorded the conversation between the defendant and Battle. That tape was introduced into evidence,

7

without objection, as Gov't Exh. 2 ("Cruiser DVD"). While the tape also recorded video, the camera faced forward from the cruiser dashboard and, thus, the tape did not capture either Battle or the defendant on video.

Battle told the defendant, within seconds of entering the cruiser: "Alright, they can't find the handguns, and that was the deal on the handguns." Cruiser DVD at 13:06:40. The defendant repeatedly asked Battle whether he could talk to Webster, go look for the guns, and/or speak to his wife and find out if she put them someplace. Battle initially resisted, and then pulled his cruiser over to the side of the road and contacted Webster *via* cell phone. The following exchange ensued:

>Battle to Webster: He is adamant, if I bring him there, he can produce those items. . . .
>
>Battle to Defendant: They said you left the house with a duffle bag, you took a duffle bag with you. That's what his whole concern is about, is about that duffle bag full of guns. What did you do with that duffle bag full of guns?
>
>[Approximately 20 seconds of silence.]
>
>Battle to Defendant: Last chance.
>
>Battle to Defendant While Listening to Webster: We can't find the guns, you lied to us, so . . . .
>
>Defendant: We have a deal . . . if I can find them, we still have a deal?
>
>Battle to Defendant While Listening to Webster: They're going to get a search warrant for your storage bin, they're going get a search warrant for your mother's house . . . .
>
>Defendant: If I produce them, do we still have the deal and everything?
>
>Battle to Webster: If he produces them, does he still have the deal?
>
>Battle to Defendant: It's up to you.[3]

---
[3] Battle testified that he did not recall whether he said, "It's up to you" to Webster or to the defendant, although he believed he said it to Webster. After listening carefully to the tape, I resolve doubts in the defendant's favor. Battle *(continued on next page)*

> Defendant: Is that a yes?
>
> Battle to Defendant: Do you know where they are?
>
> Defendant: I'm pretty sure I know . . . .
>
> Battle to Defendant: Where are they? Where are they? Where are they?
>
> Defendant: In a car at my work.

*Id*. at 13:11:11. Battle described Webster as having been "animated" during this conversation, and speaking loudly into the phone, a characterization with which Webster did not disagree. Webster's voice can be heard on the tape, although his words are inaudible.

As it happened, Webster instructed Battle to tell the defendant not only that he would be applying for search warrants but also that (i) the offer was off the table, (ii) he would find the handguns on his own, and (iii) he would note in his report that the defendant was finally cooperative, if the defendant chose then to disclose the handguns' true location. Webster conveyed none of those things to the defendant prior to his confession.

Following his confession, Battle obtained the defendant's oral consent to search the vehicle, a BMW parked in the lot at the defendant's place of employment on Forest Avenue. The defendant also gave Battle permission to retrieve his car key from his property bag, which Battle had placed in the front seat of the cruiser. Battle and Webster met at an agreed-upon spot, and Battle provided Webster the BMW key. As Webster approached Battle's cruiser, he told the defendant: "You're going to be charged." *Id*. at 13:17:10. The defendant pleaded with Webster to give him a break, explaining that he lied because he was afraid that he was going to lose his job. Webster held firm, stating: "You've made your bed. I didn't. I had nothing to do with this.

---
used the same louder, more distinct tone of voice in stating, "It's up to you," that he had used in other statements that clearly were directed to the defendant rather than to Webster. In any event, as Battle himself admitted on cross-examination, the defendant could have understood that statement to be directed to him.

I gave you a great opportunity. You chose not to take it. . . . You looked right at me, and you lied. So because of that, you'll be charged." *Id*. at 13:19:56. Webster did agree to put in his report that the defendant eventually had been cooperative, and he did.

Battle took the defendant to the Cumberland County Jail, while Webster proceeded to the lot on Forest Avenue. He opened the car trunk and retrieved a black bag, eventually found to contain most of the missing handguns. He also seized a gun that the lot owner had retrieved from a jacket belonging to the defendant at his place of employment, as well as court paperwork found in the jacket.

## II. Discussion

The defendant seeks to suppress nearly all statements that he made to police on February 15, 2010, on the bases that (i) Webster violated his *Miranda* rights in failing to respect his request to stop the questioning and obtain an attorney, (ii) his waiver of his right to remain silent was neither voluntary, knowing, or intelligent because obtained by deceptive police promises, and (iii) his statements were coerced and, hence, involuntary. *See* Motion To Suppress at 3-10. During oral argument, defense counsel contended that these violations require suppression of all statements made by his client following his unheeded assertion of his *Miranda* rights at 11:32:52 a.m. on February 15, 2010. Defense counsel also sought suppression of the guns seized from his client's BMW as "fruit of the poisonous tree."[4]

The government bears the burden of proving both *Miranda* compliance, *see, e.g., United States v. Barone*, 968 F.2d 1378, 1384 (1st Cir. 1992), and the voluntariness of a confession, *see, e.g., United States v. Jackson*, 918 F.2d 236, 241 (1st Cir. 1990). For the reasons that follow, I

---

[4] "Under the 'fruit of the poisonous tree' doctrine, all evidence derived from the exploitation of an illegal search or seizure must be suppressed, unless the Government shows that there was a break in the chain of events sufficient to refute the inference that the evidence was a product of the Fourth Amendment violation." *United States v. Rivas*, 157 F.3d 364, 368 (5th Cir. 1998).

conclude that the government meets its burden with respect to each of the defendant's points. Therefore, I recommend denial of his motion to suppress.

### A. Asserted Invocation of Rights To Cease Questioning, Obtain Counsel

In *Edwards v. Arizona,* 451 U.S. 477 (1981), the Supreme Court held that law enforcement officers must immediately cease questioning of a suspect who clearly asserts his or her right to have counsel present during interrogation. *See Edwards*, 451 U.S. at 484-85. However, the Court left open the question of how law enforcement should respond when a suspect makes a reference to counsel that is ambiguous or otherwise insufficiently clear. That issue was addressed in *Davis v. United States,* 512 U.S. 452 (1994), in which the Supreme Court declined "to extend *Edwards* and require law enforcement officers to cease questioning immediately upon the making of an ambiguous or equivocal reference to an attorney." *Davis*, 512 U.S. at 459. The Court held that, "after a knowing and voluntary waiver of the *Miranda* rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney." *Id*. at 461. The Court observed:

> Of course, when a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney. That was the procedure followed by the NIS agents in this case. Clarifying questions help protect the rights of the suspect by ensuring that he gets an attorney if he wants one, and will minimize the chance of a confession being suppressed due to subsequent judicial second-guessing as to the meaning of the suspect's statement regarding counsel. But we decline to adopt a rule requiring officers to ask clarifying questions. If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him.

*Id*. at 461-62.

With respect to the level of clarity required to invoke a suspect's right to counsel, the Court explained:

> To avoid difficulties of proof and to provide guidance to officers conducting interrogations, this is an objective inquiry. Invocation of the *Miranda* right to counsel requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney. But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning.
>
> . . . Although a suspect need not speak with the discrimination of an Oxford don, he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, *Edwards* does not require that the officers stop questioning the suspect.

*Id*. at 458-59 (citations and internal quotation marks omitted) (emphasis in original).

In reaching this result, the Court considered the information-gathering function of law enforcement. First, the Court recognized that "when the officers conducting the questioning reasonably do not know whether or not the suspect wants a lawyer, a rule requiring the immediate cessation of questioning would transform the *Miranda* safeguards into wholly irrational obstacles to legitimate police investigative activity because it would needlessly prevent the police from questioning a suspect in the absence of counsel even if the suspect did not wish to have a lawyer present." *Id.* at 460 (citation and internal quotation marks omitted). Second, the Court considered that *Edwards* "provides a bright line that can be applied by officers in the real world of investigation and interrogation without unduly hampering the gathering of information" and that, if the Court "were to require questioning to cease if a suspect makes a statement that *might* be a request for an attorney, this clarity and ease of application would be lost." *Id.* at 461 (emphasis in original). In weighing the interests at stake, the Court stated:

> We recognize that requiring a clear assertion of the right to counsel might disadvantage some suspects who – because of fear, intimidation, lack of linguistic skills, or a variety of other reasons – will not clearly articulate their right to counsel although they actually want to have a lawyer present. But the primary

> protection afforded suspects subject to custodial interrogation is the *Miranda* warnings themselves.

*Id.* at 460.

In *Berghuis v. Thompkins*, 130 S. Ct. 2250 (2010), the Court extended these principles to the invocation of the right to cease questioning, stating: "[T]here is no principled reason to adopt different standards for determining when an accused has invoked the *Miranda* right to remain silent and the *Miranda* right to counsel at issue in *Davis*." *Berghuis*, 130 S. Ct. at 2260.

During oral argument, counsel for the government contended that the defendant did not sufficiently clearly invoke his right either to counsel or to cease interrogation and, hence, police did not transgress his *Miranda* rights in continuing to question him. She argued that a defendant bears some responsibility for making sure that his or her request is heard, that the defendant in this case did nothing when Webster talked over him, that it should have been apparent that his statement was inaudible, and that the audible portion of his request was ambiguous. She contended that, even had his entire statement been audible, his demeanor, attitude, and word choice at the point when he made the statement, and throughout the interview, did not convey an unambiguous desire to cease questioning or invoke his right to counsel.

During oral argument, defense counsel underscored that a suspect need not "speak with the discrimination of an Oxford don" to invoke the right to counsel or the right to remain silent, *Davis*, 512 U.S. at 459; *see also Berghuis*, 130 S. Ct. at 2260. He argued that, in common parlance, the use of the phrase "I guess" does not undermine a declarative sentence. For example, he noted, a waiter hearing a patron state, "I guess I'll have the Brew House ale," would bring him or her that beverage, not question whether he or she meant to order it. He argued that, post-*Davis*, the typical case in which ambiguity has been found concerns equivocal statements such as, "Maybe I should get a lawyer," in contrast to the declarative, "I guess I should get a

13

lawyer." He asserted that, rather than listening for the defendant's invocation of *Miranda* rights, as he argued that officers must, Webster impermissibly badgered the defendant into further discussion. He noted that in *Kyger v. Carlton*, 146 F.3d 374 (6th Cir. 1998), the United States Court of Appeals for the Sixth Circuit not only held a suspect's statement that he would "just as soon have an attorney" unambiguous, but also stated that, if the request were equivocal, subsequent statements by police constituted "an inappropriate effort at pressuring Kyger to answer, rather than an appropriate attempt to get Kyger to clarify his response." *Kyger*, 146 F.3d at 379. The court stated: "This would also render this questioning constitutionally infirm." *Id.*

I conclude that the defendant did not unambiguously invoke either his right to counsel or his right to cease questioning. First, his use of the phrase, "I guess," twice, spoken while lowering his voice, conveyed uncertainty. Had Webster heard the entire statement, a "reasonable officer in light of the circumstances would have understood only that the [defendant] *might* be invoking the right to counsel" and the right to cease questioning. *Davis*, 512 U.S. at 459 (emphasis in original); *Berghuis*, 130 S. Ct. at 2260; *see also, e.g., Sechrest v. Ignacio*, 549 F.3d 789, 807 (9th Cir. 2008) ("We have . . . held that the statements, 'I think I would like to talk to a lawyer,' and 'maybe [I] ought to see an attorney' were not clear and unambiguous requests for counsel."); *United States v. Peters*, 435 F.3d 746, 751 (7th Cir. 2006) (noting that "case law in this area is strict" and that requests held ambiguous by courts include, "I might want to talk to an attorney[,]" "I just don't think that I should say anything," and "I need somebody that I can talk to[.]"); *United States v. Mees*, No. 4:09CR00145 ERW, 2009 WL 1657420, at *9 (E.D. Mo. June 10, 2009) (statements, "Then I guess I'm just gonna wait until I get a lawyer and I don't know what else (inaudible)[,]" and "I guess I need to wait and talk to a lawyer[,]" did not constitute unambiguous, unequivocal requests for an attorney).

14

Second, because the defendant happened to be speaking particularly softly when making the statement in question, and Webster spoke in a louder voice over him, the latter part of his sentence was inaudible. It should have been apparent to the defendant that Webster had not heard it and, thus, the defendant had not clearly conveyed it.

Third, the portion of the statement that Webster did hear was, in itself, ambiguous: "I guess this is where I have to stop . . . ." While the Supreme Court has stated that asking clarifying questions is the better practice, Webster's failure to do so is immaterial: The Court has expressly declined to require that such clarifying questions be asked. *See, e.g., Davis*, 512 U.S. at 461-62; *Berghuis*, 130 S. Ct. at 2260. To the extent that *Kyger* holds that a failure to clarify an ambiguous request for counsel transgresses *Miranda*, it does not square with *Davis*.

### B. *Miranda* Waiver

As the First Circuit has noted:

> A defendant may make a valid waiver of his rights under *Miranda* if he does so voluntarily, knowingly and intelligently. The district court must begin with the presumption that the defendant did not waive his rights. The government bears the burden of proving a valid waiver by a preponderance of the evidence.

*United States v. Downs-Moses*, 329 F.3d 253, 267 (1st Cir. 2003) (citations omitted). A waiver is considered "voluntary" if it was "the product of a free and deliberate choice rather than intimidation, coercion and deception"; it is "knowing and intelligent" if "made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon." *United States v. Rosario-Diaz*, 202 F.3d 54, 69 (1st Cir. 2000) (citations and internal quotation marks omitted). The question of whether a given waiver was voluntary, knowing, and intelligent is examined with reference to "the totality of the circumstances and the facts surrounding the particular case including the background experience and conduct of the accused." *Id.* (citation and internal quotation marks omitted).

15

The defendant contends that his waiver of his right to remain silent was rendered involuntary by the deceptive tactic of repeated promises that he would not be charged if he confessed the location of the handguns. *See* Motion To Suppress at 6-8. He adds that the same deception undermined his capacity to appreciate the nature of that right and the consequences of his decision to abandon it. *See id*. at 8-9. Having been repeatedly assured that he would not be subject to a gun possession charge if he disclosed the whereabouts of the guns, he had no appreciation that forgoing his right to remain silent would lead to the negative consequences that he now faces. *See id*.[5]

As argued by counsel for the government, a careful review of the videotapes submitted into evidence reveals that the defendant made strategic, voluntary, and knowing choices concerning what he revealed to the police, and when. Webster at no point endeavored to deceive the defendant, and the defendant was not in fact deceived, by his promises. While Battle, in the moments before the crucial confession, did employ a deceptive tactic (wittingly or unwittingly), the defendant was not thereby deceived into confessing. His waiver of his right to remain silent was voluntary, knowing, and intelligent.[6]

---

[5] In his papers, the defendant argued, for purposes of the voluntariness prong of the *Miranda* waiver inquiry, that he had been intimidated, coerced, and deceived into waiving his right to remain silent by the promise that he would not be charged with a crime if he disclosed the guns' location. *See* Motion To Suppress at 7. During oral argument, defense counsel focused, for purposes of the voluntariness prong, on the asserted deception, acknowledging that the First Circuit observed in *United States v. Byram*, 145 F.3d 405 (1st Cir. 1998), that trickery is not automatically coercion but that it *can* undermine the force of a *Miranda* warning. *See Byram*, 145 F.3d at 408 ("Certainly some types of police trickery can entail coercion: consider a confession obtained because the police falsely threatened to take a suspect's child away from her if she did not cooperate. But trickery is not automatically coercion. . . . Given the narrowed definition of coercion in [*Colorado v.*] *Connelly*, 479 U.S. 157 (1986),] it would be very hard to treat as *coercion* a false assurance to a suspect that he was not in danger of prosecution. (Of course, a false assurance might undercut the gist of a warning, raising questions whether *Miranda* had been satisfied; but that is a different problem that we need not address since no *Miranda* warnings at all were given here.") (citations omitted) (emphasis in original).

[6] The defendant does not argue that he did not *initially* make a valid *Miranda* waiver after being informed of his rights. The Interview Room DVD discloses that he did. Webster read each right aloud, pausing to ask if the defendant understood it, and the defendant stated that he did. Nothing in the videotape indicates that the defendant lacked the capacity to comprehend his rights. He appears intelligent, articulate, calm, and even at times relaxed. Further, at oral argument, defense counsel acknowledged that his client had had some involvement with the police

*(continued on next page)*

The videotapes reveal that Webster repeatedly promised the defendant that he would not be subjected to a gun charge if he disclosed the guns' location. Nonetheless, Webster made clear from the outset that he sought "honesty" from the defendant. Just prior to Webster's departure to search for the guns that the defendant had said would be in the attic, Battle warned: "Don't throw out this [inaudible] deal, don't be holding back." Interview Room DVD at 11:43:05. Webster himself stated, just prior to leaving: "I think you're fucking lying to us, and that's not going to help you. . . . I hope for your sake you're telling the truth." *Id*. at 12:00:50. When the defendant then rejoined, "You've already given me a deal[,]" Webster stated: "I have. But we've got to find the guns." *Id*. at 12:02:20. The defendant, who had removed the guns from his residence some hours earlier and placed them in the trunk of his BMW at work, knew as Webster departed the interview room that the "deal's" precondition was not about to be satisfied.

Rather than being induced by Webster's and Battle's promises to forgo his right to remain silent and to disclose the location of the handguns, the defendant chose to lie about their whereabouts in an apparent attempt to advantage himself, in circumstances in which the risk of scuttling the offered "deal" by his mendacity should have been apparent.[7] Simons made clear in placing the defendant under arrest, and the defendant understood, that Webster had, or at least likely had, rescinded the "deal" on confirming his suspicions that the defendant had lied. *See id.* at 1:01:28 (statement to defendant by Simons: "as far as a good offer and everything else – it sounded too good to be true to me – but he [Webster] said that it . . . hinged on getting all truth . .

---

prior to his arrest on February 15, 2010. After reading the defendant his rights, Webster omitted to ask whether he agreed to waive them and speak to him. However, "a waiver of *Miranda* rights may be implied through the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver." *Berghuis*, 130 S. Ct. at 2261 (citation and internal quotation marks omitted). The defendant readily began answering questions following the reading of his rights.

[7] The defendant later told Webster that he lied out of fear that he would lose his job if he led police to his workplace, where the guns were stored. He evidently had hoped to cover up his lie by blaming someone else for the removal of the guns from the attic. But the police did not buy that explanation.

17

. . He just called me and says he's not convinced after what he's found out, I don't know exactly what."), 1:03:32 (defendant's statement: "So when he [Webster] was talking to the camera up there and said he wasn't going to rescind it and all that, that was just a lie? I don't understand.").

Later, when Battle was on his cell phone with Webster, and the defendant was given a "last chance" to come clean, the defendant twice asked whether, if he produced the guns, he and Webster still had a deal. Battle, for whatever reasons, did not pass along Webster's statement that the deal was off, instead stating: "It's up to you." Cruiser DVD at 13:13:02. That ambiguous statement, standing alone, could have left the false impression that the deal was still on. Yet, the defendant pressed: "Is that a yes?" *Id*. at 13:13:04. Battle never assured him that it was, offering no response at all, before beginning to press him as to the guns' whereabouts. In the absence of the reassurance that he was seeking, the defendant decided to take his chances that Webster would in fact make good on the offer when the guns' location was finally disclosed. That did not work out as he had hoped. Yet, at all times, he knowingly, intelligently, and voluntarily chose to make disclosures at such a time, and in such a fashion, as he deemed advantageous to himself.[8]

---

[8] It is not clear that the defendant even sets forth a valid theory of *Miranda* waiver violation. The First Circuit has expressed doubt that, in circumstances in which a suspect has made a valid *initial* waiver of *Miranda* rights, and has not clearly and unequivocally invoked one or more of those rights during questioning, a *Miranda* violation occurs when police allegedly mislead or trick the suspect during questioning. *See United States v. Bezanson-Perkins*, 390 F.3d 34, 41 (1st Cir. 2004) ("There is an obvious tension in the argument [made by Bezanson-Perkins that, after a valid *Miranda* waiver, during the interrogation the police misled or tricked him]: defendant voluntarily and validly waived the presence of counsel and right to remain silent, thus subjecting himself to the risk of his self-incriminating responses to police misstatements not corrected by counsel; but he nonetheless seeks to immunize himself from that risk afterward by saying that because the police made misstatements, he can invalidate the waiver. It is doubtful, under *Moran* [*v. Burbine*, 475 U.S. 412 (1986)], that any such rule exists."). However, because I find that the defendant's waiver of his right to remain silent was not the product of deception, I need not consider whether deceptive tactics during an interrogation have any bearing on the validity of a suspect's earlier valid waiver of *Miranda* rights and, if so, in what circumstances.

## C. Voluntariness of Statements

The defendant raises a final basis for suppression of evidence: that his statements were the product of coercive questioning and, hence, involuntary. *See* Motion To Suppress at 9.

Involuntary confessions violate the due-process clauses of the Fifth and Fourteenth amendments. *See, e.g., United States v. Genao*, 281 F.3d 305, 310 (1st Cir. 2002). In the face of a defendant's claim that his confession was extracted involuntarily, the government bears the burden of showing, based on the totality of the circumstances, that investigating agents neither "broke" nor overbore his will. *Chambers v. Florida,* 309 U.S. 227, 239-40 (1940). As this language suggests, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary[.]'" *Connelly,* 479 U.S. at 167. *See also, e.g., Rice v. Cooper*, 148 F.3d 747, 750 (7th Cir. 1998) ("A confession or other admission is not deemed coerced or involuntary merely because it would not have been made had the defendant not been mentally defective or deranged. The relevant constitutional principles are aimed not at protecting people from themselves but at curbing abusive practices by public officers.") (citation omitted).

As defense counsel acknowledged during oral argument, the First Circuit has expressly stated that "it would be very hard to treat as *coercion* a false assurance to a suspect that he was not in danger of prosecution." *Byram*, 145 F.3d at 408 (emphasis in original); *see also, e.g., United States v. Boskic*, 545 F.3d 69, 80 (1st Cir. 2008) ("Although the fact that the agents allowed [the suspect] to believe that he was not under investigation may have made him less guarded and self-protective, that deception alone did not make his statements involuntary."); *Bezanson-Perkins*, 390 F.3d at 41 ("The Supreme Court has rejected challenges to confessions on the basis that they were procured by deceits.").

Because, as discussed above, the government has demonstrated that the defendant's confession was not *procured* by deceit but rather was voluntarily made, and, in any event, the above-quoted First Circuit precedent suggests that challenges to confessions based on the type of deceit here alleged fail as a matter of law, suppression is not warranted on this basis.

### III. Conclusion

For the foregoing reasons, I recommend that the Motion To Suppress be **DENIED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within fourteen (14) days after being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 14th day of September, 2010.

/s/ John H. Rich III
John H. Rich III
United States Magistrate Judge